OTIS FULLER v. A. A. ELLIS, ATTORNEY GENERAL.

*Public officers—Removal—Constitutional law—Warden of State House of Correction—Quo warranto.*

1. Act No. 118, Laws of 1893, which provides for the appointment by the board of control of the House of Correction and Reformatory at Ionia of a warden, who shall be removable by the board for cause, after opportunity has been given him to be heard upon written charges, is not in conflict with section 8, art. 12, of the Constitution, which vests in the Governor power to remove from office certain State officers, nor with section 2, art. 3, of the Constitution, which prohibits the exercise by any person belonging to one department of the government of the powers properly belonging to another, except in the cases expressly provided in the Constitution.

2. The power of removal conferred upon the board of control is broader than that vested in the House of Representatives by section 1, art. 12, of the Constitution, and in the Governor by section 8 of the same article, and includes the question of capacity and diligence; and moral turpitude on the part of the warden is not necessarily involved.

3. It is sufficient if the charges preferred contain specific statements of infractions of the laws or of the rules and regulations

which the warden should observe, and specify the facts depended upon to show incompetency or unfitness, and which require a removal from the standpoint of the best interests of the institution; and as the information upon which they must be based is largely within the control of the warden, and can only be obtained by investigation, it is not to be expected that the formality of criminal pleading should be used, and it is enough if tangible statements of fact are made, sufficient to apprise the warden of the nature of the accusation he is to meet.

4. The fact that the charges filed are the result of an investigation by the board of control, and are signed by one of the members of the board, will not disqualify such member from participating in the hearing and determination of the case, or render the proceedings void.

5. *Quo warranto* is the usual method of settling questions of title to office, and it is important to the public as well as the parties that unnecessary delays be avoided; and especially is this true in cases where large public interests are at stake, and considerable amounts of the public money may be improvidently used;[1] citing *Attorney General v. May*, 97 Mich. 568.

*Mandamus*. Argued November 14, 1893. Granted December 8, 1893.

Relator applied for *mandamus* to compel respondent to file an information in the nature of *quo warranto* to test the title to the office of warden of the State House of Correction at Ionia. The facts are stated in the opinion.

*Geer & Williams* and *William O. Webster*, for relator.

*A. A. Ellis*, respondent, in *pro. per.*

HOOKER, C. J.   The relator claims the office of warden of the State House of Correction, and applies for a *man-*

___

[1] See *Wagenseil v. Stevenson*, *post*, holding that, upon a judgment of amotion from office, the party amoved is divested of all official authority, and excluded from office, so long as the judgment remains in force; that the relator needs no writ to invest him with the office, and under How. Stat. § 8639, is entitled to take upon himself the execution thereof, which right cannot be defeated or suspended by suing out a writ of error and giving a bond to stay execution.

*damus* to compel the Attorney General to file an information in the nature of *quo warranto* against the present incumbent. The respondent's answer sets up several reasons for refusing, viz.:

1. The unconstitutionality of Act No. 118, Laws of 1893, under which relator claims his appointment.
2. The want of sufficiently specific charges against the present incumbent in the proceedings for removal.
3. The disqualification of the board of control to pass upon the charges, by reason of the fact that one of the members of the board made the charge.
4. Bad faith on the part of the board in its adjudication.

The constitutionality of the law is attacked upon the ground that section 8, art. 12, of the Constitution restricts the power of removal of the warden to the Governor. The section reads as follows:

"The Governor shall have power, and it shall be his duty, except at such time as the Legislature may be in session, to examine into the condition and administration of any public office, and the acts of any public officer, elective or appointed, to remove from office for gross neglect of duty, or for corrupt conduct in office, or any other misfeasance or malfeasance therein, either of the following State officers, to wit: The Attorney General, State Treasurer, Commissioner of Land Office, Secretary of State, Auditor General, Superintendent of Public Instruction, or members of the State Board of Education, or any other officer of the State, except legislative and judicial, elective or appointed, and to appoint a successor for the remainder of their respective unexpired terms of office, and report the causes of such removal to the Legislature at its next session."

There may be a question whether this provision of the Constitution named should apply to any officers of the State not specifically mentioned in or provided for by the Constitution. It is contended that it applies to all public officers whose duties pertain to State affairs; and the case of *Dullam v. Willson,* 53 Mich. 392, is relied upon to

sustain the proposition.   That case arose upon proceedings
before the Governor against a trustee of the asylum for
the deaf and dumb, at Flint.   It turned upon the character
of the charges, and there is perhaps room for the conten-
tion that the question suggested, viz., whether section 8 is.
broad enough to cover officers elected or appointed under
acts of the Legislature, is yet an open one.   If, however,
it should be conceded that the effect of that decision was
to place the trustee within that section, does it follow that
the warden of the House of Correction is?   The several
departments and State institutions are by law placed in
charge of specific officers and boards.   From the first,
these offices and institutions have been administered and
operated through a constantly increasing force of subordi-
nates, who worked under directions or regulations prescribed
by their superiors.   It may probably be said with safety
that all of these subordinates are provided by law, and
certainly many if not most of them arise to the dignity
of public officers, as contradistinguished from mere con-
tractors.   Among these may be mentioned the deputies of
the various State and county officers, and the superin-
tendents, wardens, and possibly other subordinates of the
State institutions.   Many if not all of these have been
removable by their superiors,—some at will, others for
cause,—and the authority of the superiors seems not to
have been questioned.   Thus, we have a construction of
the Constitution acted upon for upwards of 30 years since
the adoption of section 8 of article 12.   Previous to that
time the same power had been exercised under the present
and previous Constitutions.   The language of Mr. Justice
CHAMPLIN in *Clay v. Stuart*, 74 Mich. 415, a case of the
removal of a county officer, shows the importance of the
power.   It is as follows:

"The Legislature is to provide by law for the removal
of county officers, etc., in such manner as to them shall

seem just and proper.   The power conferred is in its nature political, and has reference exclusively to the polity of government, which would be inherently defective if no remedy of a summary nature could be had to remove from office a person who, after his election, had been convicted of crime, or who neglected his duty, or who was guilty of malversation in the administration of his office. Every person elected to a county, township, or school-district office holds . it subject to removal in the manner provided by law under this section of the Constitution, which commits to the Legislature the whole subject of removal.    They are to prescribe the mode in which it shall be done, and this includes everything necessary for the accomplishment of the object. The causes, the charges, the notice, the investigation, and the determination, and by whom these shall be conducted and the removal adjudged, are all in the discretion of the Legislature."

Again, the language of the amendment must be enlarged to make it cover subordinates.    As preliminary to the exercise of the power of removal, it makes it the duty of the Governor to examine into the condition and administration of the office, and the acts of the officer.    It limits the removal to cases of gross neglect of duty, corrupt conduct in office, and misfeasance or malfeasance therein.    It specifically mentions several of the State officers, and gives the Governor power to appoint the successor in case of removal. We think that it was not intended that the Governor should investigate the conduct of deputies and other subordinates, or that he should appoint their successors, both of which it would be proper for the head of the department, i. e., the State officer proper, or board, to do.    We must assume that the framers of the constitutional amendment knew that officers named in the Constitution were beyond the power, so far as removal is concerned, of any department of government, except as provided by the Constitution, and that they also knew that all officers which the Legislature might provide for by law were necessarily subject to the power which created the offices.    We think,

therefore, that it was not intended that section 8 should apply to subordinates. It was so held in the case of *Portman v. Fish Com'rs*, 50 Mich. 258, in which case the necessity of such a rule was pointed out. See, also, *State v. Smith* (Wash.), 33 Pac. Rep. 974.

The constitutionality of the act giving power of removal to the board of control is also attacked under section 2, art. 3, of the Constitution, which reads as follows:

"No person belonging to one department shall exercise the powers properly belonging to another, except in the cases expressly provided in this Constitution."

This is upon the theory that the right to an office, where removal is sought for cause, can only be tried by some officer belonging to the judicial department under the Constitution. This subject has been discussed in the case of *Dullam v. Willson*, and mentioned in *Clay v. Stuart*, but in neither case was it necessary to decide the question. It needs no argument to show that constitutional rights cannot depend upon the importance of the office. If it be once admitted that incumbents of public offices created by the Legislature have the constitutional right to have the question of removal determined by the judicial department, the rule must extend to every public officer in the State who is not removed from the operation of the rule by the Constitution itself. These subordinate officers are elected or appointed under laws made by the Legislature, which are subject to alteration or repeal at the will of the Legislature, with the Governor's approval, or without it, if a majority of two-thirds can be obtained; and the Legislature may vacate the office directly, as was done by the act of 1891, which was repealed by that in question. Thus, under this contention, we have a peculiar condition of things, viz., under the settled law the Legislature may remove officers at will, but may only delegate the power to remove

for cause to the judicial department.    Again; the Legisla-
ture has power to provide for State institutions, and the
election of their officers.    It may give the boards of trust-
ees power of appointment and removal of subordinates at
will, but, under respondent's contention, a legitimate limi-
tation upon the power of removal, requiring removals to be
reasonable and not arbitrary, results in the deprivation of
the board of all power of removal, upon the theory that the
act becomes purely judicial, being for cause.    To make this
more apparent:    The Legislature may remove subordinates
at will.    It may authorize the board of control to do the
same, and without notice or reason.    But, if it requires re-
movals to be made by the board only when there is good
reason for it, it confers no power of removal at all.    Such
is the absurd result that is reached when we assume that
all removals for cause are acts of such a judicial nature
that only the constitutional judiciary can perform them.

The peculiarity of this is the more apparent when we
examine the question in the light of the Constitution.
The section (8) which provides a forum for the hearing of
questions with a view to the removal of State officers for
causes therein mentioned is not as old as the Constitution.
From 1836 to 1862 there was no such provision.    It is said
in *Dullam v. Willson* that up to that time impeachment
was the only way of removing an officer of the State, and
that was limited to cases of corrupt conduct in office,
crimes, and misdemeanors.    So that, if the respondent is
right in his contention, unless the courts had jurisdiction,
there was no power that could remove a State officer, and
all, from the highest to the lowest, were secure, no matter
how incompetent or unworthy, drunk, cruel, or negligent,
until the Legislature should remove by the passage of a
law.    There never has been a time in the history of the
State when the courts have attempted to exercise this power

of removal. But this is not the end of the difficulty. While the Constitution committed to the Legislature the power to remove county and township and school-district officers, all municipal officers were passed without mention. They were as clearly officers as any others, and, while the power of appointment was given in many instances, the power of removal was not, and, if restricted to removals for cause, the officers were upon the same footing as those of the State.

We think that the framers of the Constitution were alive to the importance of the power of speedy removal of subordinates and other officers. They were evidently familiar with the rule that constitutional officers, whose terms were fixed by the Constitution, were beyond the power of the Legislature; hence, the insertion of section 7, which gave the power as to county and township officers, most of whom are constitutional officers. They evidently considered the constitutional State officers as subject to impeachment until 1861, when that was found inadequate, and the Governor was given power to act in the absence of the Legislature. Even here it seems not to have occurred to the Legislature that the courts had power in the premises.

It is no new doctrine that the exigencies of government require prompt removal of incompetent or unfaithful officers, and we cannot discredit the intelligence of the framers of the Constitution by supposing them ignorant or negligent of it. As shown, they intelligently covered the subject as to constitutional officers, and may we not properly assume that they understood that the Legislature had full power, under established and well-settled rules, to deal with others? The State has existed nearly 60 years, during all of which time officers and boards have been created, with power of appointing and removing subordinates,—sometimes at will or pleasure, sometimes with concurrence of others, sometimes for cause,—before it was.

discovered that the constitutional provision that no person belonging to one branch of the government shall perform the functions of either of the others was a limitation of the power of the Legislature in these matters. Meantime, this Court has repeatedly refused to interfere with removals of subordinates, and it is not too much to say that the three departments of government have concurred in the recognition of the power, and it is as plain that none of them ever supposed that the power of removal was limited to a department that had never been suspected of having any jurisdiction of such matters. *Portman v. Fish Com'rs,* 50 Mich. 258; *Wellman v. Board of Police,* 84 Id. 558; 91 Id. 427.

To the proposition that removing boards perform acts which are judicial in their nature, we readily assent. They must hear and determine, when the power is limited to removals for cause. So must boards of review, auditing boards, highway and drain officers, pardon boards, and in fact nearly every officer who has duties to perform; and it is also true that the action of all of these is subject to review in courts of justice. None of them, however, belong to the judicial department of government, nor can they be called judicial officers, though all perform acts in their nature judicial. Their acts are administrative. *Donahue v. County of Will,* 100 Ill. '94; *State v. Hawkins,* 44 Ohio St. 98.

There are many cases which hold that removals for cause are acts of a judicial nature. There are others which hold that they can be performed by none but judicial officers. These last are based upon the theory that the incumbent of an office has rights thereto and interests therein, and that removal for cause necessarily involves ignominy and discredit, which forbids the exercise of the power of removal by officers not judicial. So far as applied to removals for the causes mentioned in the Constitution, viz., misconduct

in office, crimes, and misdemeanors, we might, for the purposes of this case, safely admit the latter, though we reserve the question.    As to interest in and right to an office not constitutional in its character, the weight of authority, including Michigan cases, is to the effect that a public office is a trust; that the public interest and rights are paramount; and that all offices not constitutional are taken subject to the vicissitudes of legislative action, among which are removals by the appointing power, whether such power may be exercised arbitrarily, or upon investigation and discovery of adequate cause.    *Frey v. Michie,* 68 Mich. 328. It is legitimate and proper for the Legislature to guard against hasty or partisan action by boards, by requiring the publicity which comes of written charges and a hearing; and where this is required, though the action may be said to be, in a sense, judicial, it is not in the sense contended for, and the turpitude of the act constituting cause cannot embarrass the government by depriving the board of power to remove, on the ground that the officer has a right to a trial by the judicial department.    We think the cases of *Dullam v. Willson* and *Clay v. Stuart,* as well as the other cases in Michigan, are not at variance with this doctrine, though the language used in some of them might at first blush lead us to think otherwise.    The case of *Wellman v. Board of Police,* 84 Mich. 558, 91 Id. 427, is one where this Court asserted the power of the board, although the offense was a felony.    The question was there raised and settled in accord with what has been said.    See, also, *Stadler v. Detroit,* 13 Mich. 346; *Board of Auditors v. Benoit,* 20 Id. 185.

The next question requiring attention pertains to the charge upon which the action of the board was based. The act provides that the warden shall only be removed for cause.    What is meant by cause?    If we look to the Constitution for light upon this subject, we shall find that

causes for impeachment are limited to corrupt conduct in office, crimes, and misdemeanors. Const. art. 12, § 1. Removals by the Governor under section 8, art. 12, may be for gross neglect of duty, corrupt conduct in office, or any other misfeasance or malfeasance therein. We can mention many other things which would justify a State officer or board in removing a subordinate. Negligence, bad habits, slovenliness, want of discretion, incompetency, or anything else which would show unfitness for the place, and inability to perform the duties in a satisfactory manner and in accordance with the best interests of the State, would justify his removal. Moral turpitude is not necessarily involved, and, as was well said in the case of *Wellman v. Board of Police,* 91 Mich. 427:

"If the question of the plaintiff's fitness for the office involved an inquiry as to whether he was or was not guilty of a criminal offense, to the extent that is necessary to determine the question of fitness, the board had the right to enter upon the trial of the question of his guilt."

So, in this case, the power of removal of subordinates for cause, conferred upon the board by the act in question, is broader than the constitutional powers alluded to, and must, from the nature of things, involve the questions of capacity and diligence; otherwise, it would be impossible for any board to manage a prison upon business principles. The charges preferred in this case were:

1. A general charge of incompetency and unfitness, under section 5 of the act, in which the language of the section was followed.

2 and 3. A general charge that the warden had not practiced rigid economy in all matters pertaining to the prison and in the employment of prisoners, required by section 44. Among the specifications under the latter charge were the following:

*a*—That he has employed too many keepers.

*b*—That the keepers and guards were not properly graded.

*c*—That convicts were allowed to eat at the officers' mess, thereby increasing the expenses.

*d*—That he has employed as matron his wife, at an expense of $40 a month, and, as assistant matron, the wife of his son, at $20 a month.

*e*—That he employed J. H. Parsell as keeper, and paid him a keeper's salary, when he did not perform the work of keeper, or any work pertaining to the prison.

*f*—That he paid to the last three persons mentioned sums of money each month largely in excess of the value of their services.

*g*—That he paid employés who performed the duty of guards the salary of keepers, thereby increasing the expenses.

*h*—That he paid exorbitant prices for beef used in the prison.

*i*—That the expense incurred in conducting and managing the prison is largely in excess of what it ought to be.

4. That from December, 1892, to July, 1893, inclusive, he paid to convicts, for work called "work over time," $964.35.

5. That he has employed persons as matron and assistant matron, having no legal right to do so.

6. That he has not been in constant attendance at said prison, as required by section 7 of said act.

A radical difference exists between removals of State officers for the causes mentioned, and the removal of subordinates by their superiors; and while, in this case, the law requires the charges to be presented in writing, it is sufficient if they contain specific statements of infractions of the law, or of the rules and regulations which the accused should observe, and specify the facts depended upon to show incompetency or unfitness, and which require a removal, from the standpoint of the best interests of the institution. As the information upon which these must be based is largely within the control of the warden, and can only be obtained by investigation, it is not to be expected that the formality of criminal pleading should be used, and it is enough if tangible statements of fact are made, sufficient to apprise the accused of the nature of the

accusation that he is to meet. These may in part depend upon the rules that are made for his guidance, which constitute the law by which he is in part governed. One section of this statute requires that the warden shall practice rigid economy, and manifestly this may be, to some extent, a matter of opinion. He is charged with failing to do this in a number of particulars, e. g., in the number of keepers, and the grading and paying of officers, in the payment of salaries alleged to be excessive and unlawful, and in the payment of salaries to specific persons, who performed no service. He is also charged with employing persons illegally, and with not having been in attendance upon the prison as required by law. We think many of these charges were sufficiently specific, some of which alone, if proven, would justify removal. Others, which might not separately be cause for removal, might, when taken collectively, warrant the exercise of the power. The merits cannot be determined here. They are for the board, and we cannot disturb its decision in this proceeding, when it appears that the board has jurisdiction. *Wellman v. Board of Police,* 91 Mich. 427.

The charges filed were the result of an investigation made by the board, and were signed by one of the members. It is contended that this disqualified such member from participating in the hearing and determination of the case, and rendered the proceedings void. Nothing indicates that the board or the member who preferred the charges had a personal interest therein, pecuniary or otherwise, and we think the action was proper. The law evidently contemplates that, if the investigation which it is the duty of the board to make shows reasonable grounds for removal, an opportunity shall be given the warden to be heard upon specific charges before he can be removed. Removals would probably be few, were the board to wait for private persons to move, which would seldom be practicable. *Andrews v.*

*King,* 77 Me. 234; *State v. Police Com'rs,* 49 N. J. Law, 170.

As to the remaining charge, viz., that of bad faith upon the part of the board, we think it cannot be gone into upon this hearing without trying the merits of the controversy between the two claimants of the office. For the purpose of this hearing, we must assume that the action of a board of control of a State institution, of which the Governor of the State is a member, is in accord with the best interests of the institution, and that it does no intentional violence to private rights. If such a question can be tried anywhere, it is not in this proceeding; and, as we cannot legitimately question the good faith of the board, the Attorney General, who is by law the legal representative of the State, can safely leave the matter to the parties in interest.

*Quo warranto* is the usual method of settling questions of title to office. It is important to the public as well as the parties that unnecessary delays should be avoided; that the term of the office in dispute be not permitted to expire pending the law's delay. Especially is this true in cases where large public interests are at stake, and considerable amounts of the public money may be improvidently used. See *Attorney General v. May,* 97 Mich. 568. In this case the relator has tendered the usual bond to secure the State against loss, and is entitled to have the relief asked.

The writ will issue as prayed.

The other Justices concurred.