Markman, C.J. (dissenting).
I respectfully dissent from the majority's affirmance of the judgment of the Court of Appeals. The majority concludes that the proposal at issue, i.e., the Voters Not Politicians (VNP) proposal, is eligible for placement on the November 2018 election ballot by the initiative process of Const 1963, art 12, § 2. I dissent because I conclude that the proposal constitutes a "general revision" of the Constitution and thus is eligible for placement on the ballot only by the convention process of Const 1963, art 12, § 3.
I. INTRODUCTION
This case, I would emphasize, does not concern whether the VNP proposal is wise or unwise, prudent or imprudent. Nor does it concern whether the people of this state possess the ultimate authority to restructure the government of this state, for they indisputably do. Rather, it concerns only whether the VNP proposal is better understood as a constitutional "amendment," and thus eligible for placement on the ballot by the initiative process, or a "general revision" of the Constitution, and thus eligible for placement on the ballot only by the convention process.
**108 The "people" have been referenced frequently during oral argument and by the majority opinion, as if merely to invoke their name compels the conclusion that the present measure must be placed on the ballot. However, the "people" wear many hats. The "people" invoke the initiative *279 process, or at least 315,654 "people" do so; the "people" vote on the initiative process; "[w]e, the people" have ordained and established our Constitution, Const 1963, preamble; all political power is inherent in the "people," Const 1963, art 1, § 1 ; government is instituted for the equal benefit, security, and protection of the "people," id .; laws and ordinances issued under the Constitution define the rights and responsibilities of the "people"; and, of course, 13 "people," all randomly selected, are to sit on the commission established by the VNP proposal. After assessing the interests of the "people" in this matter, I believe that what is most significant is that these "people" have made it reasonably clear that the permanent things of their Constitution are not to be cast away lightly-that while ultimately the "people" do possess the authority to restructure their own charter of government, as to the most fundamentally redefining of these changes, this restructuring will be done only after the most reflective and deliberative processes of decision-making. And my further assessment persuades me that the "people" would find "fundamentally redefining" a restructuring of their Constitution that deprived them and their chosen representatives of any role in the foundational process of our system of self-government-the process by which election districts are established, citizens are joined together or separated by political boundaries, and the building blocks of our governing institutions are determined. Inserted in place is the governance of 13 randomly selected "people" entirely lacking in any democratic or electoral relationship with the other 10 **109 million "people" of this state or their elected representatives. In the end, the "people" must be allowed to do as they see fit; they can diminish the realm of governance of their representatives (and substitute in its place an "independent" and unaccountable commission) and they can dilute the relationship between themselves and their representatives, but the "people," as I understand them to have spoken through their Constitution, have also insisted that, before a change of this magnitude takes place, a serious and considered public conversation must first take place, affording opportunities for sustained and focused debate, give-and-take, compromise, and modification.
Furthermore, references to the fact that the commission is to be "independent" obscures the fundamental change that the proposed measure would make to the "people's" Constitution as well; the great value of our Constitution is not the "independence" of public bodies but rather the separation of powers and the checks and balances that define relationships between public bodies and thereby limit and constrain their authority. While the VNP commission would indeed be "independent," most conspicuously, it would be "independent" of the people's representatives in the Legislature, independent of the people, and independent of the processes of self-government, especially the processes by which the "people"-in whose name both VNP and the majority purport to speak-exert their impact upon the "foundational" process of redistricting. Our constitutional heritage is poorly described by advocates of this proposal as one predicated upon the "independence" of public bodies; it is far better described as predicated upon the exercise of public authority that is limited, separated, subject to appropriate checks and balances, and accountable to the citizenry. The proposed new commission is grounded upon none of these. Whatever its **110 merits, the creation of this commission would effect "fundamental" change upon both our constitutional charter and the system of government operating under this charter. It thus clearly warrants the kind of careful deliberation best afforded *280 by the processes of constitutional "revision" set forth in Article 12, § 3 of this state's Constitution.
II. BACKGROUND
The people have reserved to themselves the authority to modify the Constitution by petition and popular vote. "This Court has consistently protected the right of the people to amend their Constitution in this way, while enforcing constitutional and statutory safeguards that the people placed on the exercise of that right." Protect Our Jobs v. Bd. of State Canvassers , 492 Mich. 763, 772, 822 N.W.2d 534 (2012). Indeed, a century ago, in Scott v. Secretary of State , 202 Mich. 629, 643, 168 N.W. 709 (1918), this Court stated:
Of the right of qualified voters of the State to propose amendments to the Constitution by petition it may be said, generally, that it can be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises. But the right is to be exercised in a certain way and according to certain conditions , the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution. [Emphasis added.]
In the instant case, we must decide whether the right is being exercised "in a certain way and according to certain conditions ... being found in the Constitution." Id .
Const 1963, art 12, § 2 addresses amendments of the Constitution through the initiative process and provides:
**111 Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law. The person authorized by law to receive such petition shall upon its receipt determine, as provided by law, the validity and sufficiency of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon.
Any amendment proposed by such petition shall be submitted, not less than 120 days after it was filed, to the electors at the next general election. Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law.
The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption. Such statement of purpose and caption shall be prepared by the person authorized by law, and shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment.
If the proposed amendment is approved by a majority of the electors voting on the question, it shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution at the end of 45 days after *281 the date of the election at which it was approved. If two or **112 more amendments approved by the electors at the same election conflict, that amendment receiving the highest affirmative vote shall prevail.
Const 1963, art 12, § 3 addresses general revisions of the Constitution through the convention process and provides:
At the general election to be held in the year 1978, and in each 16th year thereafter and at such times as may be provided by law, the question of a general revision of the constitution shall be submitted to the electors of the state. If a majority of the electors voting on the question decide in favor of a convention for such purpose, at an election to be held not later than six months after the proposal was certified as approved, the electors of each representative district as then organized shall elect one delegate and the electors of each senatorial district as then organized shall elect one delegate at a partisan election. The delegates so elected shall convene at the seat of government on the first Tuesday in October next succeeding such election or at an earlier date if provided by law.
The convention shall choose its own officers, determine the rules of its proceedings and judge the qualifications, elections and returns of its members. To fill a vacancy in the office of any delegate, the governor shall appoint a qualified resident of the same district who shall be a member of the same party as the delegate vacating the office. The convention shall have power to appoint such officers, employees and assistants as it deems necessary and to fix their compensation; to provide for the printing and distribution of its documents, journals and proceedings; to explain and disseminate information about the proposed constitution and to complete the business of the convention in an orderly manner. Each delegate shall receive for his services compensation provided by law.
No proposed constitution or amendment adopted by such convention shall be submitted to the electors for approval as hereinafter provided unless by the assent of a majority of all the delegates elected to and serving in the **113 convention, with the names and vote of those voting entered in the journal. Any proposed constitution or amendments adopted by such convention shall be submitted to the qualified electors in the manner and at the time provided by such convention not less than 90 days after final adjournment of the convention. Upon the approval of such constitution or amendments by a majority of the qualified electors voting thereon the constitution or amendments shall take effect as provided by the convention.
This Court has long recognized that there is a rational distinction between an "amendment" and a "revision." Kelly v. Laing , 259 Mich. 212, 242 N.W. 891 (1932) ; Sch. Dist. of City of Pontiac v. City of Pontiac , 262 Mich. 338, 345, 247 N.W. 474 (1933). In Kelly , this Court addressed this distinction in the context of proposed changes to a municipality's home-rule charter. As we then explained:
Revision implies a re-examination of the whole law and a redraft without obligation to maintain the form, scheme, or structure of the old. As applied to fundamental law, such as a constitution or charter, it suggests a convention to examine the whole subject and to prepare and submit a new instrument, whether the desired changes from the old be few or many. Amendment implies continuance of the general plan and purport of the law, with corrections to better accomplish its purpose. Basically, revision suggests fundamental change, while amendment is a correction of detail .
*282 [ Kelly , 259 Mich. at 217, 242 N.W. 891 (emphasis added).]
Furthermore:
An amendment is usually proposed by persons interested in a specific change and little concerned with its effect upon other provisions of the charter . The machinery of revision is in line with our historical and traditional system of changing fundamental law by convention , which experience has shown best adapted to make necessary readjustments. [ Id . at 221-222, 242 N.W. 891 (emphasis added).]
**114 Finally, we held in Kelly that "[b]oth from the number of changes in the charter and the result upon the form of government , the proposal to abolish the office of city manager requires revision of the charter and must be had by the method the statute provides therefor." Id . at 223-224, 242 N.W. 891 (emphasis added).[1]
Subsequently, in Pontiac Sch. Dist. , 262 Mich. at 345, 247 N.W. 474, we held that a proposed amendment regarding property taxes constituted an amendment, rather than a revision, because it "does not so interfere with or modify the operation of governmental agencies as to render it other than an amendment by way of an addition to the Constitution." (Emphasis added.)[2]
**115 Thereafter, in *283 Citizens Protecting Michigan's Constitution v. Secretary of State , 280 Mich. App. 273, 305, 761 N.W.2d (2008) ( Citizens ), the Court of Appeals held that "in order to determine whether a proposal effects a 'general revision' of the constitution, and is therefore not subject to the initiative process established for amending the constitution, the Court must consider both the quantitative nature and the qualitative nature of the proposed changes ." (Emphasis added.) "More specifically, the determination depends on not only the number of proposed changes, or whether a wholly new constitution is being offered, but on the scope of the proposed changes and the degree to which those changes would interfere with, or **116 modify, the operation of government ." Id . (emphasis added). The Court of Appeals ruled that the Reform Michigan Government Now! (RMGN) proposal constituted a general revision, id . at 307, 761 N.W.2d 210, and this Court affirmed in an order, Citizens Protecting Michigan's Constitution v. Secretary of State , 482 Mich. 960, 755 N.W.2d 157 (2008).[3] **117 Most recently, in *284 Protect Our Jobs v. Bd. of State Canvassers , unpublished per curiam opinion of the Court of Appeals, issued August 27, 2012 (Docket No. 311828), 2012 WL 3660260, addressing whether a proposed amendment concerning collective bargaining rights was a general revision or an amendment, the Court of Appeals reasoned that the proposed initiative was an amendment because it "is limited to a single subject matter, and it only directly adds one section to the constitution and changes one other ...." Id . at 2. The panel further held that "[t]he initiative proposal here is far more akin to a correction of detail than a fundamental change , when viewed in the proper context of the constitution as a whole." Id . at 2-3 (emphasis added). On appeal, this Court affirmed, but on wholly different grounds dealing with the republication requirement. Protect Our Jobs , 492 Mich. 763, 822 N.W.2d 534.
III. STANDARDS
What I believe fairly can be derived from these decisions is that for at least the past 85 years in Michigan, governing law concerning direct constitutional change has been characterized by the following:
**118 (a) alternative constitutional procedures exist for instituting such change and (b) determining which of these procedures is to be utilized in a particular instance requires an assessment of the "qualitative nature" of the proposed change-that is, the extent to which the proposal "[impacts] our form of government," entails "fundamental" change, or "would interfere with, or modify, the operation of government." While these standards have been phrased differently over time in judicial decisions, they are nonetheless consistent in supplying this common guidance.
While reasonable persons therefore may articulate these standards in slightly different ways, as indeed might the justices on this dissent, these standards are nonetheless consistent and compatible with each other, as well as with what is required by our Constitution, in distinguishing between the realms of the initiative and the convention. And while election disputes tend disproportionately to arise in the same circumstances as this case, this counsels in favor of greater rather than lesser deference to reasonably settled standards, while the majority purports to alter these standards. I say "purports" because, as discussed in further detail later, I do not believe that the majority's application of its standard in this case is actually all that different from these longstanding standards, only that the majority articulates its standard in a novel manner.
The Court of Appeals in the instant case purported to apply the standards set forth in Citizens and Protect Our Jobs . Citizens Protecting Michigan's Constitution v. Secretary of State , 324 Mich. App. 561, --- N.W.2d ----, 2018 WL 2746592 (2018) (Docket No. 343517) (CPMC ). The first question then concerns whether these decisions articulated the proper standard for determining whether a proposal constitutes an "amendment" or a "revision," and I **119 believe that they do, although I would clarify several points. Most importantly, I believe that the ultimate judicial assessment depends most upon the qualitative nature of the proposed changes, i.e., whether these would "fundamentally" alter *285 the nature or operation of our government. Although the quantitative nature of the proposed changes may sometimes also be relevant in this assessment, it is not determinative or even on an equal footing with the qualitative nature of the proposed changes. For example, if there were a proposal to modify all the references to "he" in the Constitution with "he or she," that would constitute a substantial quantitative change. However, it would not seemingly implicate anything fundamental in a qualitative sense, and therefore the proposal would almost certainly constitute an "amendment" rather than a "revision." On the other hand, if there were a proposal to transform the position of the governor into a lifetime appointment, although this would require relatively few textual modifications in the Constitution, such a change would be significant in a qualitative sense, and therefore the proposal would likely constitute a "revision" rather than an "amendment." Accordingly, I would clarify the focus of our caselaw to emphasize the qualitative impact of the proposed changes rather than the quantitative impact.
Similarly, I would clarify that while the sheer number of subjects to which a proposal pertains is also a relevant consideration, it is for the same reason as just observed pertaining to the sheer number of textual changes, not necessarily a dispositive consideration. For example, if there was a proposal to change our Legislature from bicameral to unicameral, although that would relate to a single subject, it would nonetheless constitute a fundamental change to the nature and operation of our government and therefore would constitute **120 a "revision" rather than an "amendment."[4] Article 12, § 2 of Michigan's 1963 Constitution requires the ballot to contain "a statement of the purpose of the proposed amendment ...." (Emphasis added.) Because "the" is a definite article and "purpose" is a singular noun, it seems reasonably clear that this phrase "statement of the purpose of the proposed amendment" likely contemplates a single purpose. See Robinson v. Detroit , 462 Mich. 439, 462, 613 N.W.2d 307 (2000). Therefore, if a proposal contains multiple purposes, it would not seem to constitute an amendment under Const 1963, art 12, § 2. However, this is not the only constitutional limitation on the meaning of an amendment.[5] In other *286 words, although a proposal that **121 contains multiple purposes cannot be considered an amendment under Const 1963, art 12, § 2, a proposal that contains a single purpose is not necessarily an amendment under that same provision.
Article 12 of Michigan's Constitution sets forth two very different ways by which our Constitution can be directly modified.[6] One way is by the amendment process set forth in Const 1963, art 12, § 2. This process requires the supporters of a proposed amendment to obtain a certain number of signatures from registered electors of the state in order for the proposal to be placed on the ballot, i.e., "10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected," and then once it is placed on the ballot, it requires "approv[al] by a majority of the electors voting on the question ...." Id . The other way the Constitution can be directly modified is by the revision process set forth in Const 1963, art 12, § 3. This process requires a majority of electors to vote in favor of a convention; it then requires electors to choose delegates; it then requires delegates to meet, deliberate, and propose new constitutional language; and finally, it requires a majority of qualified electors to support the new or modified constitutional language.
The latter obviously sets forth a lengthier and more deliberative process. It is a process by which issues can be thoroughly discussed and debated in a structured and sustained manner, and in which proposed language can be clarified and refined. It is also a process in which give-and-take among persons of disparate viewpoints **122 can be pursued, proposals and counterproposals fleshed out, compromises undertaken, and risks to our historical form of government assessed and minimized. That is, it is a process considerably different from the amendment process in which voters, after a reasonably brief period of consideration (roughly 90 days in the present case), and after a very different type of public debate, must accept or reject the proposed amendment in whole. It makes sense that our Constitution would provide, and our Court would recognize, as both have for the past 85 years, that there are distinctions between "amendments" and "revisions" and that each process serves a distinctive need within our governmental and constitutional systems. The broader and the more fundamental the proposed changes, the more likely these would be of a character requiring the deliberativeness of the convention process; the more discrete and limited the proposed changes, the more likely these would be of a character requiring the expedition of the initiative process.[7] *287 **123 For the reasons generally set forth in this opinion, I disagree with the majority that the standard set forth by our precedents over 85 years ago is not reasonably grounded in the text of the Constitution itself or that I myself "do[ ] not engage in a textual analysis of our Constitution[.]" Given that the people decided to incorporate two very different processes of modifying the Constitution, these differences must be given meaning, and one way by which to do this, in addition to assessing text and caselaw, is to examine the manifest purposes of these alternative processes in light of their respective strengths and weaknesses. Such an analysis makes reasonably clear that the people intended for broader and more fundamental changes to the Constitution to be accomplished by way of the general revision/convention process, while more narrow and discrete changes would be accomplished by way of the amendment/initiative process. This understanding is reinforced by the fact that when the people adopted the 1963 Constitution containing these alternative processes, Kelly and Pontiac Sch. Dist. had already been decided; therefore, the people already would have been apprised that this reflected the judicial understanding of the differences between the two processes. See People v. Nutt , 469 Mich. 565, 575, 677 N.W.2d 1 (2004) ("We conclude that, at the time of the ratification of our 1963 Constitution, the people of this state intended that the words 'same offense' be construed consistent with state and federal double jeopardy jurisprudence as it then existed."). In other words, this would have been the "common understanding" of the people at the time the 1963 Constitution was ratified. See **124 Goldstone v. Bloomfield Twp. Pub. Library , 479 Mich. 554, 558, 737 N.W.2d 476 (2007) ("When interpreting constitutional provisions, our primary objective is to realize the intent of the people by whom and for whom the constitution was ratified. That is, we seek the 'common understanding' of the people at the time the constitution was ratified.") (quotation marks and citation omitted).
Furthermore, I do not believe that the majority's standard is any less "vague" than the standard set forth by our precedents over the course of 85 years. Indeed, I do not believe that the majority's standard, in particular its application of that standard, is very much different from the standard set forth by our precedents. This is especially true when one looks to the meaning that the majority ascribes to "changes that are tantamount to the creation of a new constitution."[8] The majority *288 articulates the standard in terms **125 of whether the proposal "propose[s] changes that significantly alter or abolish the form or structure of our government in a way that is tantamount to creating a new constitution." Kelly , too, spoke of a revision in terms of creating "a new instrument," producing "fundamental change," and changing "the result upon the form of government ...." Kelly , 259 Mich. at 217, 223-224, 242 N.W. 891. Similarly, Pontiac Sch. Dist. spoke in terms of whether the proposal would "so interfere with or modify the operation of governmental agencies as to render it other than an amendment ...." Pontiac Sch. Dist. , 262 Mich. at 345, 247 N.W. 474.[9]
The majority, to its credit, does not hold that any changes short of a total rewrite of the Constitution can be considered an "amendment." Rather, the majority recognizes that an amendment is "limited to proposing less sweeping changes," and the majority focuses, just **126 as I do, on the "qualitative" significance of the proposed changes to determine whether the changes would significantly alter our government, as the majority recognizes that "[a] constitution ... is more than words on a page," "[i]ts most basic functions are to create the form and structure of government, define and limit the powers of government, and provide for the protection of rights and liberties," and "[t]hese are the basic threads of a constitution, and when they are removed, replaced, or radically rewoven, the whole tapestry of the constitution may change." Well said![10] Indeed, in its application section, the majority considers, just as I do, the extent to which the VNP proposal would take power away from the three different branches of government, i.e., how the proposed changes would "affect *289 the branches' relative powers," for example, "how the proposal would change the present Constitution with regard to the Legislature," whether "[t]he executive branch [would be] significantly affected by the proposal," and how "VNP's proposal [would] change[ ] the judicial branch's role in the redistricting process." In other words, although the majority and I reach very different conclusions, I do not believe that our tests are all that different; we engage in similar inquiries and consider in common whether the proposed changes would fundamentally alter our system of government.
To emphasize again, it is not that the people in Michigan, if they choose to do so, cannot radically restructure their government by the direct processes of constitutional change (subject, of course, to federal constitutional requirements, such as the obligation of **127 states to preserve a "Republican [or representative] Form of Government," US Const, art IV, § 4 ), but merely that the most consequential of proposed changes require greater forethought and deliberation. This is a precondition for direct constitutional change prudently recognized 100 years ago-a century before today's "emergency" decision-when this Court observed that the process of direct change must be carried out "in a certain way and according to certain conditions ... found in the Constitution." Scott , 202 Mich. at 643, 168 N.W. 709.
IV. PRESENT CONSTITUTION
In order to determine whether the VNP proposal would fundamentally alter the nature or operation of our government and Constitution, we must obviously understand the manner in which these presently operate. We begin with what the Constitution, ratified in 1963, originally stated, although we have not operated under that system for the past 36 years. The Constitution as ratified in 1963 called for state legislative districts to be apportioned under a weighted formula based on land area and population. Const 1963, art 4, §§ 2 and 3. It also provided that senatorial districts should be "compact, convenient, and contiguous by land, [and] as rectangular in shape as possible ...." Const 1963, art 4, § 2 (2). In addition, house districts were to "consist of compact and convenient territory contiguous by land." Const 1963, art 4, § 3. It also established a commission on legislative apportionment "consisting of eight electors, four of whom shall be selected by the state organizations of each of the two political parties whose candidates for governor received the highest vote at the last general election at which a governor was elected preceding each apportionment."
**128 Const 1963, art 4, § 6. And it provided that the commission should "receive compensation provided by law" and that the Legislature should "appropriate funds to enable the commission to carry out its activities." Id . With regard to this Court's involvement in redistricting, that Constitution also provided:
If a majority of the commission cannot agree on a plan, each member of the commission, individually or jointly with other members, may submit a proposed plan to the supreme court. The supreme court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section.
Upon the application of any elector filed not later than 60 days after final publication of the plan, the supreme court, in the exercise of original jurisdiction, shall direct the secretary of state or the commission to perform their duties, may review any final plan adopted by the commission, and shall remand such plan to the commission for further action if it fails to comply with *290 the requirements of this constitution. [Id .]
However, in Reynolds v. Sims , 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L. Ed. 2d 506 (1964), the United States Supreme Court ruled that weighted land area/population formulas violated the Equal Protection Clause and that states must "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable."[11] In **129 In re Apportionment of State Legislature-1982 , 413 Mich. 96, 116, 321 N.W.2d 565 (1982), this Court held that "[t]he weighted land area/population formulae, invalidated by Reynolds v. Sims ... and the remaining apportionment rules of art 4, §§ 2 - 6, are inextricably interdependent and therefore are not severable." "Similarly, the function of the commission, which depends on those rules, and indeed the commission itself, are not severable from the invalidated rules." Id . Accordingly, this Court struck down both the apportionment rules and the commission itself.[12]
Subsequently, the Legislature, in 1996, enacted guidelines for the redistricting of the Senate and **130 House of Representatives, see MCL 4.261 et seq ., and, in 1999, it enacted the Congressional Redistricting Act, MCL 3.61 et seq . Thus, after the past two federal decennial censuses, redistricting has occurred without a commission, as the Legislature has decided the districts. The commission originally formulated in the 1963 Michigan Constitution has not been active since 1972, and it has in no way been a part of that Constitution since 1982.[13] *291 MCL 4.261 grants the Legislature the authority to enact a redistricting plan and sets forth the guidelines that it must follow. This Court has original and exclusive jurisdiction to hear and decide all cases or controversies involving a redistricting plan. MCL 4.262(1). This Court has the authority to modify the plan or remand the plan to a special master for further action if the plan fails to comply with the statutory requirements. MCL 4.262(3). If the Legislature fails to enact a redistricting plan before the deadline, this Court has the authority to create a redistricting plan. MCL 4.263. To summarize, the redistricting commission created by the 1963 Constitution was shortly thereafter struck down and in its place the people, through their elected representatives, restored the power to redistrict back to the Legislature.[14] **131 V. VNP PROPOSAL
The VNP proposal would strike all that is currently in the Constitution regarding redistricting and in Article 4, § 6 would create an "independent citizens redistricting commission."[15] Article 4, § 6(1) would provide **132 that the commission shall consist of 13 commissioners, each of whom would have to complete an application and attest under oath that he or she does or does not affiliate with one of the two major political *292 parties. VNP proposal, art 4, § 6(2)(A)(III). Each commissioner would also have to:
(B) not currently be or in the past 6 years have been any of the following:
(I) a declared candidate for partisan federal, state, or local office;
(II) an elected official to partisan federal, state, or local office;
(III) an officer or member of the governing body of a national, state, or local political party;
(IV) a paid consultant or employee of a federal, state, or local elected official or political candidate, of a federal, state, or local political candidate's campaign, or of a political action committee;
(V) an employee of the Legislature;
(VI) any person who is registered as a lobbyist agent with the Michigan bureau of elections, or any employee of such person; or
(VII) an unclassified state employee who is exempt from classification in state civil service pursuant to article XI, Section 5, except for employees of courts of record, employees of the state institutions of higher education, and persons in the armed forces of the state.
(C) not be a parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(B) of this section[.] [VNP proposal, art 4, § 6(1).]
In addition, "for five years after the date of appointment, a commissioner [would be] ineligible to hold a partisan elective office at the state, county, city, village, or township level in Michigan." VNP proposal, art 4, § 6(1)(E).
**133 The Secretary of State would have to make applications available to the general public and mail these to 10,000 registered voters "selected at random." VNP proposal, art 4, § 6(2)(A)(I). The Secretary of State would then have to "randomly" select 60 applicants for each pool of affiliating applicants and 80 applicants from the pool of nonaffiliating applicants and submit these names to the majority and minority leaders of the Senate and the Speaker of the House of Representatives and the minority leader of the House of Representatives.[16] VNP proposal, art 4, § 6(2)(D). They would be able to each strike five applicants from any pool or pools, up to a maximum of 20 total strikes by the four legislative leaders. VNP proposal, art 4, § 6(2)(E). The Secretary of State would then randomly draw the names of four commissioners from each of the two pools of remaining applicants affiliating with a major party and five commissioners from the pool of remaining nonaffiliating applicants. VNP proposal, art 4, § 6(2)(F).
Article 4, § 6(5) would provide that "the Legislature shall appropriate funds sufficient to compensate the commissioners and to enable the commission to carry out its functions, operations and activities" and that "the state of Michigan shall indemnify commissioners for costs incurred if the Legislature does not appropriate sufficient funds to cover such costs." Article 4, § 6(6)
**134 would provide that "the commission shall have legal standing to prosecute an action *293 regarding the adequacy of resources provided for the operation of the commission ...."
Article 4, § 6(13) would provide:
The commission shall abide by the following criteria in proposing and adopting each plan, in order of priority:
(A) Districts shall be of equal population as mandated by the United States Constitution, and shall comply with the voting rights act and other federal laws.
(B) Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.
(C) Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.
(D) Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.
(E) Districts shall not favor or disfavor an incumbent elected official or a candidate.
(F) Districts shall reflect consideration of county, city, and township boundaries.
(G) Districts shall be reasonably compact.
"A final decision of the commission to adopt a redistricting plan [would] require[ ] a majority vote of the commission, including at least two commissioners who affiliate with each major party, and at least two commissioners who do not affiliate with either major party." VNP proposal, art 4, § 6(14)(C).
Article 4, § 6(19) would provide:
**135 The Supreme Court, in the exercise of original jurisdiction, shall direct the Secretary of State or the commission to perform their respective duties, may review a challenge to any plan adopted by the commission, and shall remand a plan to the commission for further action if the plan fails to comply with the requirements of this Constitution, the Constitution of the United States or superseding federal law. In no event shall any body, except the independent citizens redistricting commission acting pursuant to this section, promulgate and adopt a redistricting plan or plans for this state.
Article 4, § 6(22) would provide that "the powers granted to the commission are legislative functions not subject to the control or approval of the Legislature, and are exclusively reserved to the commission."
VI. APPLICATION
To begin with, the Court of Appeals (and now the majority) err in assessing the nature of the change that would be effected by the VNP proposal by comparing the commission to be established by VNP with the commission created by the 1963 Constitution but thereafter struck down. In short, by the time of the Court of Appeals' asserted comparison, the commission created by the 1963 Constitution had not been a part of that Constitution for 36 years and had not actually been used to establish a districting plan for 46 years.[17]
**136 The Legislature *294 has been in charge of redistricting since at least 1996. Therefore, the pertinent question is not whether replacing the commission created by the 1963 Constitution with the VNP commission would fundamentally change the operation of government, but whether removing the power to redistrict from the Legislature and conferring that power in the VNP commission would fundamentally change the operation of government. We are obligated to consider how the government is currently operating in order to make the necessary comparison, not how the government might once have operated. And it currently operates (as it has almost always operated in the history of our state) with the Legislature responsible for redistricting.[18] **137 As this Court has recognized, "[e]lection redistricting is principally a legislative function," LeRoux v. Secretary of State , 465 Mich. 594, 619, 640 N.W.2d 849 (2002), redistricting "goes to the heart of the political process in a constitutional democracy," In re Apportionment of State Legislature-1982 , 413 Mich. at 136, 321 N.W.2d 565, and "[a]ny change in the means by which the members of the Legislature are chosen is a fundamental matter," id . at 136-137, 321 N.W.2d 565 (emphasis added). Indeed, one of RMGN's proposed changes would have removed from the Legislature its authority over redistricting, resituated this authority in a redistricting commission within the executive branch, and removed the procedure for judicial review of redistricting. The Court of Appeals concluded that such a proposal "affects the 'foundation power' of government by 'wresting from' the legislative branch and the judicial branch any authority over redistricting and consolidating that power in the executive branch, albeit in a new independent agency with plenary authority over redistricting." Citizens , 280 Mich. App. at 306, 761 N.W.2d 210. *295 The same is true in the present case. The VNP proposal would affect the "foundation" power of government by removing altogether from the legislative branch authority over redistricting and consolidating that power instead in an "independent" commission made up of 13 randomly selected individuals who are not in any way chosen by the people, representative of the people, or accountable to the people .[19] This, in my **138 judgment, reflects a fundamental alteration in the relationship between the people and their representatives. Instead of 10 million Michigan citizens possessing some measure of influence over the system by which election districts are established in this state and citizens joined together or separated by political boundaries and the building blocks of our governing institutions determined, the VNP proposal would substitute the decision-making of 13 randomly selected citizens. And instead of the democratically elected representatives of these 10 million people having a constitutional role in this same process, the VNP proposal would substitute the decision-making of these self-same randomly selected citizens. And thus instead of this "foundation" power of redistricting being carried out by traditional institutions of American self-government, it will instead be carried out by an "independent" **139 commission, utterly removed from the processes of self-government.
Furthermore, although this commission would nominally be placed within Article 4, describing the legislative branch of government, and invested with the legislative power of redistricting, it would nonetheless be "independent" from the Legislature. See VNP proposal, art 4, § 6(22) ("[T]he powers granted to the commission are legislative functions not subject to the control or approval of the Legislature, and are exclusively reserved to the commission."). For that reason, it is incumbent that VNP redefines, as it does, the threshold description of the "legislative power" in Article 4, § 1. That language now reads, "The legislative power of the State of Michigan is vested in a senate and a house of representatives." It would be modified to read, "Except to the extent limited or abrogated by [the VNP proposal], the legislative power of the State of Michigan is vested in a senate and a house of representatives." (Emphasis added.) This is a change occasioned by the fact that one of the Constitution's three separated powers, the "legislative power," would be exercised by a body that is neither the "senate" nor the "house *296 of representatives," but an "independent" commission. While this new language might avoid what would otherwise be an unconstitutional exercise of authority by the commission, that is only because such language alters the Constitution's fundamental expression of the legislative power.
Indeed, the proposal goes on to introduce the same prefatory language in Articles 5 and 6 of the Constitution, addressing respectively the executive and judicial powers of the Constitution,[20] each of which hitherto **140 has remained essentially unchanged since our state's first constitution in 1835. All of which merely underscores that the impact of these changes is quite "fundamental." While it is reasonably clear that the new prefatory language set forth in Article 6 is designed to communicate that current understandings of the "judicial power" are somehow to be altered, at a minimum by striking the present authority of the judiciary to initiate redistricting plans where necessary,[21] it is less clear why the prefatory language set forth in Article 5 is similarly required, although it must be presumed that this is because alterations in the exercise of the executive power are also contemplated, possibly in the extent of its ability to exercise its present veto authority[22] or its **141 general supervisory authorities over the so-called administrative branch of government. I do not know exactly what was in the mind of the drafters of the VNP proposal in these regards, but we soon will doubtlessly be apprised of this in the course of litigation seeking to make clear how truly "independent" the VNP commission is of all checks and balances, and restraints, of the sort imposed upon every other institution of government. Whereas descriptions of the administrative state as a "fourth branch" may heretofore have been exaggerated, it is difficult to survey the express authorities and the constitutional placement of the VNP commission and not conclude that it is designed to be an "independent" body of a genuinely unique character.
In sum, Article 4, § 1, Article 5, § 1, and Article 6, § 1, the foundational articles of our system of separated powers, have each *297 been modified in recognition of the authority bequeathed upon the new commission. While lawyers, scholars, and public officials may now be increasingly engaged in reconsidering the proper expanse of the administrative state-its impact upon our three branches, understandings of governmental accountability to the citizenry, and the rule of law, Michigan now embarks upon the establishment of a super-administrative, or "independent," commission to carry out the foundational role of self-government. This measure is precisely of a kind that warrants the reflection, deliberation, and consensus decision-making of the convention processes of Const 1963, art 12, § 3.[23] **142 What these three "[e]xcept to the extent limited or abrogated by" provisions most of all suggest is that the commission itself is an entirely novel institution that would fundamentally breach our Constitution's separation of powers, see Const 1963, art 3, § 2 ("The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."), but for the addition of these three provisions. Why would it be necessary to expressly redefine the wielder of each of our Constitution's three separated powers unless the VNP proposal was thought to implicate each of these?[24] Yet, *298 to the **143 extent that the commission would , in fact, wield these combined powers, it would not only be a unique constitutional institution, but in express breach of Const 1963, art 3, § 2, one of the several constitutional provisions not republished by VNP proponents. See note 27 of this opinion. Thus, this VNP commission would be as close to representing a "fourth branch" of government as any within our Constitution-an "independent" body certainly, but more relevantly for purposes of constitutional analysis, an "unaccountable" body.[25] The present issue, once again, is not the wisdom of the changes being made by the VNP proposal, but whether these changes are fundamental . I believe that they are, even by the most rigorous understanding of what is and is not "fundamental" to our constitutional system of governance.[26] **144 VII. CONCLUSION
For these reasons, I conclude that the VNP proposal, if adopted, would fundamentally change the operation of our government and, as a result, it is not an "amendment" that can be properly placed on the ballot by the initiative process under Const 1963, art 12, § 2, but rather a general "revision" that requires resort to the convention process under Const 1963, art 12, § 3.[27]
**145 It is precisely the kind of *299 "alteration of first governing principles" proposal that requires the opportunities for debate, modification, give-and-take, and compromise that are only available in the convention process. It is not the kind of proposal that the electorate should be required to "take or leave" as they cast their votes over the course of the next 90 days after digesting a "100-word or less" summary. That is, it is not the kind of proposal under our Constitution that is appropriate for the "amendment" process. Therefore, I respectfully dissent from this Court's decision to affirm the judgment of the Court of Appeals.
Stephen J. Markman
Brian K. Zahra
Kurtis T. Wilder

Appellants raised three additional constitutional provisions that they claim would be abrogated by the VNP proposal and were not republished with the circulated VNP petition: Const 1963, art 9, § 17 (concerning appropriations); Const 1963, art 1, § 5 (concerning free speech); and Const 1963, art 6, § 13 (conferring original jurisdiction on the circuit courts). Because I believe that substantial questions have been raised regarding the abrogation of Const 1963, art 11, § 1, and that this abrogation appears to be sufficient by itself to reverse the decision of the Court of Appeals, I do not address the other three constitutional provisions.

In the proposal, language being added to the Constitution is shown in all capital letters. That capitalization has been altered when quoted in this opinion to make reading the proposed language easier.

The commissioner qualifications are listed in VNP proposal, art 4, § 6(1). "Each commissioner shall" be registered to vote in Michigan, otherwise not disqualified for appointed or elected office by the Michigan Constitution, and not currently, or in the past 6 years have been (or related to anyone who has been) (1) a declared candidate, elected official, or part of a governing body for federal, state, or local office; (2) a paid consultant or employee of any elected official, political candidate, or political action committee; (3) a legislative employee; (4) a registered lobbyist; or (5) an unclassified state employee.

Const 1963, art 12, § 2 provides that petitions "shall be in the form, and shall be signed and circulated in such manner, as prescribed by law." That section subsequently provides that "[s]uch proposed [constitutional] amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law."Id .

MCL 168.482(3) provides, in relevant part:
If the proposal would alter or abrogate an existing provision of the constitution, the petition shall so state and the provisions to be altered or abrogated shall be inserted, preceded by the words:
"Provisions of existing constitution altered or abrogated by the proposal if adopted."

There is no question that the VNP proposal contemplates that redistricting commissioners would hold "office." See VNP proposal, art 4, § 6(3) (stating that "commissioners shall hold office for the term set forth in part (18) of this section" and that "[a] commissioner's office shall become vacant upon the occurrence of any of the following," including "gross misconduct in office " and "inability to discharge the duties of office ") (emphasis added).

While VNP's oath does not purport to bind a candidate's political affiliation into the future, we note that it would defeat the stated purpose of this independent "non-partisan" commission if it were to be dominated with commissioners from one side of the political aisle simply because misrepresentations were made during the application process. An enduring oath would preclude this from occurring and would be consistent with the stated purposes of VNP.

As noted above, Article 16, § 2 of the 1908 Constitution then provided "No other oath, declaration or test shall be required as a qualification for any office or public trust." The provision has since been amended to limit "test " to "any religious test ."

In light of the language of Const 1963, art 11, § 1 being changed from "test" to "any religious test," I believe that it is perfectly permissible to inquire about political affiliation, particularly for a bipartisan board position. What does not appear to be permissible, and appears incompatible with the plain language of Article 11, § 1, is requiring an oath concerning political affiliation.

A new warden, Otis Fuller, had been appointed by the board, and Fuller had to file a writ of mandamus against the attorney general to force the filing of a quo warranto action against Parsell. See Fuller v. Attorney General , 98 Mich. 96, 57 N.W. 33 (1893).

VNP contends that strict enforcement of the republication requirement of MCL 168.482(3) would be unconstitutional and that substantial compliance with this requirement by publication of the Oath Clause of Const 1963, art 11, § 1 after certification of the proposal for the ballot would be sufficient. However, Const 1963, art 12, § 2 permits the Legislature to "prescribe" "the form" of petitions. "The Legislature accepted the Constitution's invitation to set forth publishing requirements for petitions," Protect Our Jobs , 492 Mich. at 778, 822 N.W.2d 534, and does not limit the ability to abrogate any provision of the Constitution, but merely requires republication of that provision if it is to be abrogated. There is nothing unconstitutional about this "form" requirement. Moreover, as this Court made clear in Stand Up for Democracy , 492 Mich. at 602, 822 N.W.2d 159 (opinion by Mary Beth Kelly , J.), petitions for constitutional amendments must "strictly comply with the form and content requirements of the statute." We reaffirmed that "the principle articulated in Stand Up [of strict compliance with the republication requirement] applie[d] with equal force" in Protect Our Jobs . Protect Our Jobs , 492 Mich at 778, 822 N.W.2d 534. Therefore, VNP's assertion that substantial compliance is appropriate is not supported by our precedent.

The majority highlights that this Court in In re Apportionment of State Legislature-1982 , 413 Mich. at 139-140, 321 N.W.2d 565, opined that "[t]he power to redistrict and reapportion the Legislature remains with the people," but that "[t]he people, however, can only exercise that power, as a practical matter, by amending the constitution ...." I do not disagree in any way with the proposition that the power to redistrict and reapportion the Legislature remains with the people. Nor do I disagree that the people can alter the power of redistricting by amending the Constitution. However, the issue here is whether the specific proposal offered by VNP does so in a manner that can be properly characterized as an amendment, as that term is used in Const 1963, art 12, § 2, a question that was obviously not considered by this Court in In re Apportionment of State Legislature-1982 . In other words, I do not believe that any measure pertaining to redistricting would thereby be rendered inapt for consideration by the initiative process, only that the particular measure before us today does not, in my judgment, satisfy constitutional standards. For similar reasons, I do not find statements made at the constitutional convention suggesting that voter-initiated amendments could be adopted regarding redistricting to be as illuminating as does the majority. Of course, voter-initiated amendments regarding redistricting may well be compatible with either Const 1963, art 12, § 2 or Const 1963, art 12, § 3, for there are no limitations in these provisions concerning subject matter, cf. US Const, art IV, § 4. I simply believe that the present proposal is compatible only with the convention process of voter-initiated change.

I am cognizant that the commission met in 1982 and proposed redistricting plans, but this Court rejected those plans and also struck down that part of the Constitution creating the commission. In re Apportionment of State Legislature -1982 , 413 Mich. at 116, 321 N.W.2d 565.

The majority asserts that "the last time the voters had direct input on this issue, they opted for apportionment and redistricting to be conducted by a commission." (Emphasis added.) Well, that is a finely put observation, but only if one chooses to ignore the entirety of the "indirect input" in representative self-government in which the people have been engaged during the ensuing 55 years (as well as for the previous 125 years of our state's history). During that time, the people have been free to petition or otherwise to encourage their legislators to reinstate some form of commission; they have been free to elect judges and justices who might reconsider the lack of constitutionality of the former commission; they have been free to call for conventions or initiatives that might propose a new form of commission; and they have been free to urge upon their representatives whatever other alternatives to the redistricting status quo they desire. Indeed, the lack of involvement of the commission during the past four redistricting cycles, and the Legislature's involvement during the past two cycles, might have been thought sufficient to prompt some or all of these actions if they had been viewed as critical by the people.
Furthermore, none of the above discussion has anything to do with "legislative acquiescence." While it is kind of the majority to cite one of my own writings in its explanation of this doctrine, and while its analysis of the doctrine seems to me correct, it is nonetheless irrelevant in the present context. If the purpose of the above discussion had been to assert that the Legislature, by failing to replace the commission struck down in 1982, had thereby shown its opposition to the commission, that would have been an exercise in the dubious assertion of "legislative acquiescence"-although even this gives short shrift to the fact that the doctrine is exclusively one of statutory interpretation and that there is no statute here whose meaning is being considered by either this dissent or the majority. Instead, the only purpose of the above discussion is to respond to the majority that the Constitution as ratified in 1963 continues in all respects to reflect the best present intentions of the people, despite that Constitution not having been in existence in relevant respects since 1982, and despite ample opportunities since then for the people to have revived or restored the commission by a variety of constitutional means.
Finally, it warrants clarification that the "direct input" in 1963 to which the majority hearkens is exactly the kind of input that this dissent would facilitate-a statewide convention-except that this convention, unlike that in 1963, which involved a complete rewrite of the Constitution and in which voters cast no specific vote on a redistricting commission, would focus exclusively upon this matter.

The VNP proposal would also render all the statutes enacted by the Legislature regarding redistricting unconstitutional.

"The random selection process used by the Secretary of State to fill the selection pools [would have to] use accepted statistical weighting methods to ensure that the pools, as closely as possible, mirror the geographic and demographic makeup of the state[.]" VNP proposal, art 4, § 6(2)(D)(II). How such "randomness" is to be reconciled with achieving a "mirroring" of the "geographic and demographic" makeup of the state is difficult to understand, but it is a matter not now before this Court. This "random" selection process would also be predicated on all persons self-identifying as either Republican, Democrat, or independent, with certain classes of persons altogether excluded from the process, including elected officials, lobbyists, and their relatives.

Nobody would say, for example, that the congressional term limits contained in Const 1963, art 2, § 10, which were struck down by US Term Limits, Inc. v. Thornton , 514 U.S. 779, 115 S.Ct. 1842, 131 L. Ed. 2d 881 (1995) ; or the three-fifths clause of US Const, art I, § 2, superseded by the Fourteenth Amendment; or Prohibition, the Eighteenth Amendment, repealed by the Twenty-First Amendment; or the Vice President runner-up rule, US Const, art II, § 1, superseded by the Twelfth Amendment; or the apportionment requirement for income taxes, US Const, art I, § 2, superseded by the Sixteenth Amendment, remain real or operative parts of a constitution simply because these defunct provisions remain visible as bracketed antique pieces within their respective charters. It is sophistry to suggest that any of these nullified provisions define a charter of government to be deployed here for purposes of comparison with a proposed constitutional amendment whose legitimacy is dependent upon its effect on that constitution. That these provisions were once part of that charter does not mean that they remain so. No redistricting commission has been a part of Michigan's Constitution for at least 36 years. Contrary to the majority's contention, I do not believe that this Court possesses the authority to "actually amend the Constitution by deleting from it any text the [Court] declares to be unconstitutional," but who even understands what the majority is trying to say by this? It is really not complicated what this dissenting opinion has said-once this Court, or the United States Supreme Court, has struck down a provision of our Constitution, as was done in In re Apportionment of State Legislature-1982 , 413 Mich. at 116, 321 N.W.2d 565, that provision is struck down. And it is no longer a part of the Constitution. It is not, as the majority apparently believes, a part of the Constitution in abeyance, the Constitution in waiting, the backup Constitution, or the Constitution to be risen again someday. Rather, such a provision no longer has the force of law and is no longer a part of the governing charter of the state.

Indeed, both before the establishment of an apportionment commission in the 1963 Constitution, dating back to 1835, and after the commission was struck down in 1982 and legislation enacted in 1996, the Legislature has always been in charge of redistricting. See Const 1835, art 4, § 3 ; Const 1850, art 4, § 4 ; Const 1908, art 5, § 4. Notably for purposes of the present case, the only period during which this power was completely taken from the Legislature and invested in a commission-any manner of commission, much less the specific form of commission proposed by VNP-occurred as a product of the convention process, not the initiative process.

The Court of Appeals held that the VNP proposal would not wrest complete power from the legislative branch because "the legislature retains the power to veto potential commission members ...." CPMC , --- Mich. App. at ----, slip op at 19, --- N.W.2d ----. More precisely, the VNP proposal would allow 4 members of the Legislature to remove 5 applicants each from the pool of 200 applicants. I would not describe this authority as constituting an effective "legislative veto," much less an example of how the Legislature retains meaningful power over the commission. In addition, although the Court of Appeals is correct that the VNP proposal would not wrest complete power from the judicial branch, it would wrest from the judiciary its power to create its own redistricting plan. While I do not necessarily view this as a "bad" alteration of the Constitution, that is not the issue. Rather, it is whether this can be understood to constitute a "fundamental" reform of the Constitution. The majority does not answer this but instead concludes that the "Constitution offered this Court a limited array of options to review redistricting plans" and "VNP's proposal does likewise." However, the part of the "Constitution" that the majority refers to here is exactly that part that has been struck down by this Court. In other words, instead of comparing the VNP proposal to existing laws that currently define this Court's authority with regard to redistricting, the majority compares the VNP proposal to an obsolete part of the 1963 Constitution, that is, a provision that for at least the past 36 years has been a non-part of that or any other constitution.

Const 1963, art 5, § 1 would be modified to read, "Except to the extent limited or abrogated by [the VNP proposal], the executive power is vested in the governor," and Const 1963, art 6, § 1 would be modified to read, "Except to the extent limited or abrogated by [the VNP proposal], the judicial power of the state is vested exclusively in one court of justice ...." (Emphasis added.) Taken together, these redefinitions of the foundational articles and sections of our system of separated powers speak eloquently concerning the breadth of the changes being enacted by the VNP proposal. While the proposed changes may or may not ultimately prove sensible or prudent, they will almost certainly prove consequential, and that is what is at issue.

Furthermore, the VNP proposal would require the commission to consider such factors as a "state's diverse population and communities of interest," which would include, but not be limited to, "populations that share cultural or historical characteristics or economic interests." VNP proposal, art 4, § 6(13)(C). The commission would also be required to "not provide a disproportionate advantage to any political party," which would be determined by using "accepted measures of partisan fairness." VNP proposal, art 4, § 6(13)(D). And the commission would be required to "not favor or disfavor an incumbent elected official or a candidate." VNP proposal, art 4, § 6(13)(E) (emphasis added). Moreover, this Court somehow would be required to review and ensure that the commission had complied with each of these "criteria" in its adoption of redistricting plans. Contrary to the majority's contention, the plain language of these criteria in no way resembles those criteria applicable to the short-lived 1963 constitutional commission or the criteria by which the Legislature currently abides.

An authority wrongly characterized by VNP as a "legislative power" in their briefing to this Court.

The majority contends that it is appropriate to treat the VNP proposal as a voter-initiated "amendment" under Const 1963, art 12, § 2, in part, because in 1952 a voter-initiated amendment modified the Constitution to provide that "should the legislature within [a certain period of time] fail to apportion anew the representatives in accordance with the mandate of this article, the board of state canvassers, within [a certain period of time] shall apportion anew such districts in accordance with the provisions of this article ...." Const 1908, art 5, § 4. Putting aside for the moment the vast differences between these two proposals, the 1952 proposal was, to the best of my knowledge, never challenged on the basis that it was not a proper voter-initiated "amendment." The majority rejects proper judicial precedents in defining a standard for the consideration of voter-initiated amendments while invoking nonprecedents for illustrating what does and does not satisfy its own standard. Furthermore, the 1952 proposal was vastly different from the instant proposal. The 1952 proposal gave the power of redistricting to the board of state canvassers only if the Legislature failed to timely exercise that power, while the instant proposal would take the power of redistricting completely away from the Legislature and place it in the hands of an unprecedentedly "independent" redistricting commission.

Indeed, even the majority admits that "by adding this language, the proposal makes explicit what would have been implicit without the language-the proposal does have some effect on the responsibilities and powers of the branches of government," but that effect, according to the majority, does not amount to a "substantial alteration in the form or structure of our government." To say the least, I disagree with this latter conclusion and note that it is only reached after a comparison with a long-defunct commission that for a short time was part of the Constitution but has not been for at least 36 years and has not been operative for nearly half a century. In order to assess the impact of a proposed constitutional change, and by that assessment determine whether the proposal effects a "fundamental" change or a change in accordance with the majority's own standard, the majority would do better to compare the proposal with the actual Constitution than to the once-upon-a-time constitution that produces the most favorable comparison. "Changes" are generally assessed by how the present , the status quo , the current moment, the here-and-now is being affected by some new development, not by the irrelevant comparison engaged in by the majority. Accordingly, the majority does not address the critical question, which is whether the VNP proposal would fundamentally alter the government as it currently operates. Perhaps if the majority would have addressed this question, it would have agreed with this dissent that the proposal does fundamentally alter the government as it now operates. Finally, to be clear, I do not agree with the majority's comparison, even on its own terms. That is, the 1963 commission and the VNP commission bear little serious comparison with one another in terms of their scope, their "independence," and their relationship with either the other institutions of government or the "people" themselves.

"The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47 (Madison) (Rossiter ed, 1961), p. 301.

Concerning the quantitative nature of the changes effected by the VNP proposal, it would alter 11 sections within 3 articles of the Constitution, and it would add more than 3,000 words to the Constitution while deleting more than 1,000 other words. While I am not of the view that there is some numerical threshold beyond which a proposal cannot qualify for ballot placement as an initiative, these figures concerning the VNP proposal certainly demonstrate a considerable quantitative effect on the Constitution.

Plaintiffs also argue that petition supporters (VNP) did not "comply with the requirement that the petition republish any existing constitutional provision that the proposed amendment, if adopted, would alter or abrogate." Protect Our Jobs , 492 Mich. at 778, 822 N.W.2d 534 ; see also Const 1963, art 12, § 2 ; MCL 168.482(3). Because I conclude that the proposal constitutes a revision rather than an amendment, and thus cannot be placed on the ballot for that reason, it is unnecessary for me to address this argument. However, I do question whether VNP has fully complied with the republication requirement, and this is a necessary matter for consideration by the majority that would place the VNP proposal on the ballot. In particular, Const 1963, art 9, § 17 provides, "No money shall be paid out of the state treasury except in pursuance of appropriations made by law." Yet, the VNP proposal would require that "[t]he state of Michigan ... indemnify commissioners for costs incurred if the Legislature does not appropriate sufficient funds to cover such costs." VNP proposal, art 4, § 6(5) (emphasis added). Would this provision require money to be paid out of the state treasury absent an appropriation? If so, Const 1963, art 9, § 17 should have been republished and it was not. For reasons set forth earlier in this opinion, I also question whether Const 1963, art 3, § 2, setting forth the separation-of-powers principle of our state's Constitution should not have been republished. Finally, I question whether Const 1963, art 11, § 1 should have also been republished. It provides:
All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of ............. according to the best of my ability. No other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust. [Id . (emphasis added).]
Yet, the VNP proposal would require "applicants to attest under oath that they meet the qualifications set forth in this section; and either that they affiliate with one of the two political parties with the largest representation in the Legislature (hereinafter, 'major parties'), and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties." VNP Proposal, art 4, § 6(2)(A)(III) (emphasis added). Would this provision require an additional oath as a qualification for any office or public trust? If so, Const 1963, art 11, § 1 should also have been republished and it was not. Thus, three significant constitutional provisions should arguably have been republished, and they were not.